# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CITY OF DETROIT POLICE AND FIRE RETIREMENT SYSTEM, DERIVATIVELY ON BEHALF OF NISOURCE INC., | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No.  20-577-UNA |
| JOSEPH HAMROCK, ARISTEDES S. CANDRIS, CAROLYN Y. WOO, DEBORAH A. HENRETTA, ERIC L. BUTLER, KEVIN T. KABAT, MICHAEL E. JESANIS, PETER A. ALTABEF, THEODORE H. BUNTING, JR., WAYNE S. DEVEYDT, RICHARD L. THOMPSON, | ) ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| NISOURCE INC. | ) ) | |
| Nominal Defendant. | ) | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff City of Detroit Police and Fire Retirement System  ("Plaintiff"), by and through its undersigned attorneys, hereby submits this Verified Shareholder Derivative Complaint (the "Complaint") for the benefit of nominal defendant NiSource Inc. ("NiSource" or the "Company") against certain members of its board of directors (the "Board") and executive officers, seeking to remedy defendants' breaches of fiduciary duties and unjust enrichment beginning no later than 2017 and continuing to the present (the "Relevant Period").

1

Plaintiff alleges the following based upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through its attorneys, which included, among other things, a request for and inspection of certain books and records pursuant to *8 Del. C. § 220*, statements made by the Company and Individual Defendants (defined below), United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding NiSource, news reports, securities analysts' reports, information made available by the United States Government[1], including a criminal DPA entered into by the Company with the United States Department of Justice ("DOJ"), advisories about the Company, and information readily obtainable on the Internet.

## I.   INTRODUCTION

1.     On February 26, 2020 NiSource announced that it had agreed with the DOJ to plead guilty to knowing and willful violations of federal pipeline safety laws in connection with a deadly gas line explosion that had occurred on September 13, 2018 in Landover, Massachusetts, causing over $1 billion in damages (the "Greater Lawrence Explosions"). NiSource also agreed to pay a fine of $53 million -- the largest criminal fine ever imposed under the federal Pipeline Safety Act. In the DPA, NiSource *admitted* that "through a pattern of flagrant organizational indifference, [the Company] knowingly and willfully violated a minimum safety standard for the starting up and shuttering of any part of a distribution pipeline."

2.     At a press conference held on February 27, 2020, Andrew E. Lelling, the U.S. Attorney for the District of Massachusetts, said: "When we were done with the investigation, what

---

[1]     *United States v. NiSource, Inc.,* Case No. 1:20-cv-10066-FDS (February 26, 2020, D. Mass.) Deferred Prosecution Agreement ("DPA"), attached hereto as Ex. A.

was very clear was that the company as a whole had simply failed to do what it was supposed to do to maintain the public safety, and had in fact acted with what we call flagrant disregard for the public safety." Mr. Lelling also stated: "We're here because this investigation found that Columbia Gas, through a pattern of flagrant indifference in the face of extreme risk to life and property, knowingly violated minimum safety standards."

3.    The Individual Defendants' misconduct and failure to implement appropriate public safety standards devastated the financial value of NiSource's subsidiary in Massachusetts, Columbia Gas, and forced the Company to abandon operations in Massachusetts. As reflected in the DPA, the DOJ forced NiSource to sell the assets of Columbia Gas, a once highly valuable asset at a distressed price, while retaining ongoing and future liabilities associated with the Greater Lawrence Explosions. NiSource is further required to exit all gas pipeline operations in Massachusetts.

4.    Indeed, the $53 million fine was not the full extent of NiSource's potential monetary liability to the government. The government's forced sale of NiSource's Columbia Gas subsidiary requires the Company to forfeit and pay a monetary penalty for all profits realized from the sale. NiSource also agreed to the government monitoring its operations for up to three years to ensure compliance with safety regulations. In addition, the government placed NiSource on probation for three years, imposed operating conditions on all of NiSource's subsidiaries, and required it to seek a resolution of all pending civil claims, including those asserted by the Massachusetts Department of Public Utilities ("DPU").

5.    As detailed below, because of the Individual Defendants' misconduct, the Company has been severely damaged, and NiSource and its stockholders have paid for the consequences of the Individual Defendants' fiduciary failings. The Individual Defendants'

misconduct has caused the Company more than a billion dollars in actual damages to date, in addition to the record $53 million criminal fine. Analysts have estimated damages could be as high as $2 billion. According to the Board's records, a significant portion of these damages have been "out of pocket" and several hundred million dollars, at minimum, are in excess of the Company's insurance coverage. This action seeks to recover those damages for the benefit of the Company from those with the fiduciary duty to properly manage the business and affairs of NiSource – its officers and directors.

## II.   NATURE OF THE ACTION

6.     This is a stockholder derivative action brought by Plaintiff on behalf of Nominal Defendant NiSource against the Individual Defendants for breaches of their fiduciary duties of care, loyalty and candor, unjust enrichment, and their failure to disclose material information in the Company's proxy statements issued in connection with its stockholders' annual meetings in violation of Section 14(a) of the Exchange Act. Plaintiff also seeks equitable relief including appropriate changes to NiSource's corporate governance.

7.     NiSource is an energy holding company which operates both natural gas distribution and electrical distribution in six different states. The Company's subsidiaries are utility providers owned under the NiSource parent umbrella.

8.     On September 13, 2018, the Greater Lawrence Explosions happened when a series of 141 fires in as many as 40 homes and 5 explosions occurred in Lawrence, Andover, and North Andover, Massachusetts stemming from NiSource's distribution of natural gas to Massachusetts retail and commercial customers. The Greater Lawrence Explosions caused one fatality and a number of serious injuries, while forcing approximately 30,000 people to evacuate their homes. This event was one of the most damaging natural gas catastrophes in U.S. history. Moreover, this tragedy was entirely preventable had the Individual Defendants acted to adopt a pipeline Safety

Management System ("SMS") compliance regime in accord with federal and state law. This failure to adopt an SMS system at Columbia Gas, among other problems, would be cited as a significant deficiency by the National Transportation Safety Board, the DOJ and the Massachusetts DPU.

9.     Natural gas is combustible and can be deadly if safety regulations are not strictly followed and critical information is not made available to those who need it. It is for this reason that both federal and state authorities strictly regulate the transportation and distribution of natural gas. The Company's own risk disclosures acknowledge that NiSource's business involves a "variety of inherent hazards and operating risks." In other words, NiSource's natural gas utility business is a textbook example where externally imposed regulations govern "mission critical" operations. Under these conditions, Delaware law demands a good faith effort on the part of directors and senior officers to implement appropriate oversight systems and then to monitor them diligently. This obligation is buttressed by the Individual Defendants' duties to ensure that the Company is acting in accord with all legal obligations under the Natural Gas Pipeline Safety Act of 1968, the Pipeline Safety Act of 1994, and relevant state laws.

10.     Prior to instituting this lawsuit, Plaintiff conducted a thorough pre-suit inspection pursuant to *8 Del. C. §220* and reviewed thousands of pages of non-public records from NiSource's Board and one of the Board's subcommittees. ███████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████ Such behavior is incompatible with the fiduciary obligations of a director of a Delaware corporation.

5

11.     Specifically, the Individual Defendants received internal reports at regular Board Meetings and meetings of the Board's Environmental Safety and Sustainability Committee (the "ES&S Committee") regarding natural gas safety. ███████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████

███    ██████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████

13.     Unsurprisingly, the Greater Lawrence Explosions prompted investigations by federal and state government authorities and regulatory agencies. The NTSB issued a final report, adopted September 24, 2019, which concluded that "the probable cause of the over pressurization of the natural gas distribution system and the resulting fires and explosions was the Company's

weak engineering management." Ex. B at vii.[2] In other words, the NTSB blames NiSource's lack of oversight over safety protocols as the direct cause of the tragedy.

14.     In addition, statements from the Governor of Massachusetts suggested that certain information provided by NiSource was misleading, and in a Senate hearing the Company was accused of placing profits over safety. Indeed, based on another incident at a NiSource subsidiary, the government charged the Company with knowledge of its serious safety deficiencies as early as 2015, which the Company and its fiduciaries continued to ignore until after the Greater Lawrence Explosions.

15.     NiSource acknowledged "full responsibility" for the Greater Lawrence Explosions and admitted to knowing and willful violations of federal criminal laws — violations which occurred under the direct purview of the Board. Public companies rarely pay civil fines to the federal government, and criminal fines such as the one imposed on NiSource are even rarer.

16.      In short, NiSource's officers and its directors are responsible for adherence to federal and state laws, and in particular safety laws designed to protect life and property. Moreover, the ES&S Committee's duties required them to "review and evaluate the Company's programs, policies, practices and performance with respect to employee, contractor and public safety." These same officers and directors had independent duties pursuant to Delaware state law to implement reasonable safety monitoring and reporting systems on these "mission critical" matters. They utterly failed to do so, as the Board's records and the DPA confirm.

---

[2]      Ex. B, the NTSB's final report, provides a thorough technical description of what occurred. NiSource has not contested these findings and this exhibit is incorporated herein by reference. All emphasis, unless otherwise noted, is added.

### III.    JURISDICTION AND VENUE

17.    This shareholder derivative action is brought pursuant to Rule 23.1 of the Federal Rules of Civil Procedure. This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as 28 U.S.C. § 1331 for the claims asserted herein for violations of the Exchange Act. This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. § 1367. This Court also has subject matter jurisdiction under 28 U.S.C. § 1332(a) because there is complete diversity between plaintiffs and defendants and because the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

18.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because nominal defendant NiSource is incorporated under Delaware state law and many of the acts and practices complained of herein occurred in this District.

19.    The Court has jurisdiction over each defendant because each defendant is either a corporation that does sufficient business in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this court permissible under traditional notions of fair play and substantial justice.

20.    In connection with the acts and conduct alleged herein, defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the U.S. mails, interstate telephone communications, and the facilities of the national securities exchanges and markets.

## IV.   PARTIES

### Plaintiff

21.     Plaintiff City of Detroit Police and Fire Retirement System is a shareholder of NiSource and has continuously held NiSource shares since December 2013. Plaintiff is a citizen of Michigan.

### Nominal Defendant

22.     Nominal Defendant NiSource is a Delaware corporation with its principal executive offices located at 801 East 86th Avenue, Merrillville, Indiana, 46410. NiSource's securities are traded on the NYSE Stock Market under the symbol "NI."

23.     NiSource operates in Massachusetts through its wholly-owned subsidiary Bay State Gas Company, d/b/a Columbia Gas of Massachusetts ("Columbia Gas"), a Massachusetts corporation. It operates in Springfield, Brockton, Lawrence, Andover and North Andover and supplies gas to approximately 325,000 customers.

### The Individual Defendants

24.     Defendant Joseph Hamrock ("Hamrock") has served as the Company's President and Chief Executive Officer ("CEO") and a member of the Board since July 2015. In 2017, 2018, and 2019, defendant Hamrock was paid $4.3 million, $5.1 million and $6.5 million, respectively. NiSource's 2019 Proxy Statement provides the following information regarding defendant Hamrock:

> **Executive Experience:** Mr. Hamrock has been our President and CEO since July 2015. From May 2012 to June 2015, he was Executive Vice President and Group CEO for NiSource's Gas Distribution Operations, comprised of local gas distribution companies in Kentucky, Maryland, Massachusetts, Ohio, Pennsylvania and Virginia. Prior thereto, he served in a variety of senior executive positions with American Electric Power ("AEP"), an electrical service public utility holding company in Columbus, Ohio, including as President and Chief Operating Officer of AEP Ohio from January 2008 to May 2012. He also served in leadership roles

in engineering, transmission and distribution operations, customer service, marketing and information technology.

**Outside Board and Other Experience:** Mr. Hamrock is currently a member of the board of the American Gas Association, a gas industry trade association. He is also a board member of OhioHealth, a not-for-profit healthcare system in central Ohio, and A Kid Again, which supports families caring for children with life-threatening illnesses.

25.   Defendant Peter Altabef ("Altabef") has served on the Company's Board since 2017. NiSource's 2019 Proxy Statement provides the following information regarding defendant Altabef:

**Standing Board Committees:**
- Environmental, Safety and Sustainability Committee
- Finance Committee (Chair)
- Nominating and Governance Committee

**Executive Experience**: Mr. Altabef currently serves as Chairman, President and CEO of Unisys Corporation, a global information technology company, and is a member of its board of directors, a position he has held since January 2015. Prior to his current role, he served as president and CEO of MICROS Systems, Inc., a provider of integrated software and hardware solutions to the hospitality and retail industries, from 2013 to 2014, when it was acquired by Oracle Corporation. Before that, he served as president and CEO of Perot Systems Corporation from 2004 to 2009, when it was acquired by Dell Inc. Following that transaction, Mr. Altabef served as president of Dell Services, the information technology services and business process solutions unit of Dell Inc. until his departure in 2011.

**Outside Board and Other Experience**: Mr. Altabef is a member of the board of directors of Unisys Corporation. He is also a member of the President's National Security Telecommunications Advisory Committee, a board member of EastWest Institute, and a member of the advisory board of Merit Energy Company, LLC and of the board of directors of Petrus Trust Company, LTA. He has previously served as a senior advisor to 2M Companies, Inc., in 2012, and as a director of MICROS Systems, Perot Systems Corporation and Belo Corporation. He is also active in community service activities, having served on the boards and committees of several cultural, medical, educational and charitable organizations and events.

26.   Defendant Theodore H. Bunting, Jr. ("Bunting") has served on the Company's Board since 2018. NiSource's 2019 Proxy Statement provides the following information regarding defendant Bunting:

**Standing Board Committees:**
- Audit Committee
- Compensation Committee (Chair)

**Executive Experience:** Mr. Bunting most recently served as group president, utility operations, at Entergy Corporation ("Entergy"), an integrated energy company, from 2012 until his retirement in 2017. Before that, he was senior vice president and chief accounting officer at Entergy from 2007 to 2012, and chief financial officer of several subsidiaries from 2000 to 2007. He held other management positions of increasing responsibility in accounting and operations at Entergy since joining the company in 1983.

**Outside Board and Other Experience:** Mr. Bunting has been a director of Unum Group since 2013 and is currently chairman of its regulatory compliance committee and a member of its human capital committee. He previously served as a director of Imation Corp., a global data storage and information security company. He also serves on the board of Foundation for the Mid South and previously served on the board of Hendrix College.

27.     Defendant Eric L. Butler ("Butler") has served on the Company's Board since 2017. NiSource's 2019 Proxy Statement provides the following information regarding defendant Butler:

**Standing Board Committees:**
- Audit Committee
- Compensation Committee
- Environmental, Safety and Sustainability Committee

**Executive Experience:** Mr. Butler served in a number of executive leadership roles at Union Pacific Corporation ("Union Pacific"), a transportation company located in Omaha, Nebraska, until his retirement in February 2018. He began his career at Union Pacific in 1985 and held leadership roles in financial planning and analysis and in marketing, sales and commercial, including as Executive Vice President and Chief Marketing Officer from March 2012 to December 2016. He also held leadership roles in supply, procurement and purchasing, including as Vice President and General Manager – Industrial Products from April 2005 to March 2012. Most recently, he was Senior Vice President of Union Pacific from December 2017, Executive Vice President and Chief Administrative Officer from December 2016 through November 2017, and Corporate Secretary from February 2017 through November 2017.

**Outside Board and Other Experience:** Mr. Butler was appointed to the Federal Reserve Bank of Kansas City's Omaha Branch Board in 2015 and, in 2018, was

elected chairman. Additionally, he serves on the board of the Omaha Airport Authority, which he joined in 2007.

28.    Defendant Aristedes S. Candris ("Candris") has served on the Company's Board since 2012. NiSource's 2019 Proxy Statement provides the following information regarding defendant Candris:

**Standing Board Committees:**
- Environmental, Safety and Sustainability Committee (Chair)
- Finance Committee
- Nominating and Governance Committee

**Executive Experience:** Dr. Candris was President and CEO of Westinghouse Electric Company ("Westinghouse"), Pittsburgh, Pennsylvania, a nuclear engineering company, which was a unit of Tokyo-based Toshiba Corp., from July 2008 until his retirement in March 2012. During his 36 years of service at Westinghouse, Dr. Candris served in various positions, including as Senior Vice President, Nuclear Fuel, from September 2006 to July 2008, and continued to serve on the board of Westinghouse until October 2012.

**Outside Board and Other Experience:** Dr. Candris is an advisory board member of Atomos Nuclear and Space Corporation. He is also a member of the advisory boards of the Carnegie Institute of Technology and the Wilton E. Scott Institute for Energy Innovation at Carnegie Mellon University. He also serves on the boards of trustees of Transylvania University and the Hellenic-American University and the board of directors of The Hellenic Initiative. He previously served on the boards of Westinghouse, and Kurion Inc.

29.    Defendant Wayne S. DeVeydt ("DeVeydt") has served on the Company's Board since 2016. NiSource's 2019 Proxy Statement provides the following information regarding defendant DeVeydt:

**Standing Board Committees:**
- Audit Committee
- Compensation Committee
- Finance Committee

**Executive Experience:** Mr. DeVeydt has been serving as Chief Executive Officer and member of the board of directors of Surgery Partners, Inc., a healthcare services company, since January 2018. Previously, he served as a Senior Advisor to the Global Healthcare division of Bain Capital located in Boston, Massachusetts from January 2017 to January 2018, and as Executive Vice President and Chief Financial

Officer ("CFO") at Anthem, Inc., a health insurance company and an independent licensee of the Blue Cross and Blue Shield Association from May 2007 until his retirement in June 2016. He also served as Senior Vice President and Chief Accounting Officer at Anthem, Inc. beginning in 2005 and Chief of Staff to the Chairman and Chief Executive Officer from 2006 to 2007. Prior to joining Anthem, Inc., Mr. DeVeydt was a partner at PricewaterhouseCoopers LLP from 1996 to 2005, where he served in many roles in the financial services industry.

**Outside Board and Other Experience:** Mr. DeVeydt is a member of the board of directors of Surgery Partners, Inc., where he currently serves as Chief Executive Officer. He is also a member of the board of directors of Grupo Notre Dame Intermedica. He also served as a director of Myovant Sciences Ltd. from 2016 until July 2018 and served as its lead independent director, chair of its audit committee, and a member of its compensation committee. Mr. DeVeydt is an active leader in his community through his charitable activities.

30.   Defendant Deborah A. Henretta ("Henretta") has served on the Company's Board since 2015. NiSource's 2019 Proxy Statement provides the following information regarding defendant Henretta:

**Standing Board Committees:**
- Compensation Committee
- Environmental, Safety and Sustainability Committee
- Finance Committee

**Executive Experience:** Ms. Henretta currently is a partner at G100 Companies, a C-suite learning and development company, where she serves as Senior Advisor spearheading digital transformation practice for SSA & Company, a G100 Company. She retired from Procter & Gamble Co. ("P&G") in 2015, where she served as Group President of Global e-Business. Prior to her appointment as Group President of Global e-Business in January 2015, she held various senior positions throughout several P&G sectors, including as Group President of Global Beauty from 2012 to 2015 and as Group President of P&G Asia from 2007 to 2012. Prior to her appointment as Group President of P&G Asia, she was President Asia from 2005 to 2007 and President of Global Baby, Toddler and Adult Care from 2004 to 2005. She joined P&G in 1985.

**Outside Board and Other Experience:** Ms. Henretta has been a director at American Eagle Outfitters, Inc. since February 2019. Ms. Henretta has been a director at Corning Incorporated since 2013, and currently serves on its audit and corporate relations committees. She is a director of Meritage Homes Corporation, and serves on its nominating and corporate governance committees. Ms. Henretta served as a director of Staples, Inc. from June 2016 until September 2017 and

13

served on its compensation committee. Additionally, she serves on the board of trustees for Xavier University and St. Bonaventure University.

31.     Defendant Michael E. Jesanis ("Jesanis") has served on the Company's Board since 2008. NiSource's 2019 Proxy Statement provides the following information regarding defendant Jesanis:

**Standing Board Committees:**
- Audit Committee (Chair)
- Compensation Committee
- Finance Committee

**Executive Experience:** Mr. Jesanis is a co-founder and, since July 2013, has been Managing Director of HotZero, LLC, a firm formed to develop hot water district energy systems in New England. Mr. Jesanis has served as an advisor to several startups in energy-related fields. From July 2004 through December 2006, Mr. Jesanis was President and CEO of National Grid USA, a natural gas and electric utility, and a subsidiary of National Grid plc, of which Mr. Jesanis was also an Executive Director. Prior to that position, Mr. Jesanis was COO and CFO of National Grid USA from January 2001 to July 2004 and CFO of its predecessor utility holding company from 1998 to 2000.

**Outside Board and Other Experience:** Mr. Jesanis previously served as a director for several electric and energy companies, including Ameresco, Inc. Mr. Jesanis is the former chair of the board of a college and a past trustee (and past chair of the audit committee) of a university.

32.     Defendant Kevin T. Kabat ("Kabat") has served on the Company's Board since 2015. NiSource's 2019 Proxy Statement provides the following information regarding defendant Kabat:

**Standing Board Committees:**
- Audit Committee
- Compensation Committee
- Nominating and Governance Committee

**Executive Experience:** From April 2007 to November 2015, Mr. Kabat was CEO of Fifth Third Bancorp, a bank holding company. He continued to serve as Vice Chairman of the board of directors of Fifth Third Bancorp until his retirement in April 2016. Before becoming CEO, he served as Fifth Third Bancorp's President from June 2006 to September 2012 and as Executive Vice President from December 2003 to June 2006. Additionally, he was previously President and CEO

14

of Fifth Third Bank (Michigan). Prior to that position, he was Vice Chairman and President of Old Kent Bank, which was acquired by Fifth Third Bancorp in 2001.

**Outside Board and Other Experience:** Mr. Kabat has been a director of Unum Group since 2008 and is currently chairman of the board and chair of its governance committee. In 2016, Mr. Kabat became the lead independent director of E\*Trade Financial Corporation and is a member of its bank board and its compensation and governance committees. He has also held leadership positions on the boards and committees of local business, educational, cultural and charitable organizations and campaigns.

33.      Defendant Carolyn Y. Woo ("Woo") has served on the Company's Board since 1998. NiSource's 2019 Proxy Statement provides the following information regarding defendant Woo:

**Standing Board Committees:**
- Audit Committee
- Environmental, Safety and Sustainability Committee
- Nominating and Governance Committee (Chair)

**Executive Experience:** Dr. Woo was President and CEO of Catholic Relief Services, an international humanitarian agency serving over 100 countries, from January 2012 until her retirement in December 2016. Prior thereto, Dr. Woo was dean and a professor of Entrepreneurial Studies at the Mendoza College of Business, University of Notre Dame in Notre Dame, Indiana.

**Outside Board and Other Experience:** In addition to serving on our Board, Dr. Woo has been a director at AON plc since 1998, and currently serves on its audit, compliance, and organization and compensation committees. She is also on the board of Arabesque. She has previously served on the boards of directors of four additional public companies: Circuit City, St. Joseph Capital Bank, Arvin Industries and Bindley-Western Industries. She is also a current and past board member of several non-profit organizations, including an international relief organization, a global business school accreditation organization, leadership development organizations and an educational organization.

**Former Directors**

34.      Defendant Richard L. Thompson ("Thompson") was a NiSource Board member from May 2004 through May 2019. Defendant Thompson, at the time of his retirement, served as NiSource's Chairman. Upon his retirement, Thompson was replaced as Chairman of the Board by

defendant Kabat. Defendant Thompson attended all ES&S Committee meetings during the Relevant Period, despite him not being a formal member of the ES&S Committee.

35.     The defendants identified in ¶¶24-34 are sometimes referred to herein as the "Individual Defendants." The Individual Defendants also make up the entirety of NiSource's Board of Directors, previously defined as the "Board".

## V.     DEFENDANTS' DUTIES

36.     By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were, and are, required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner and in compliance with federal and state laws. The Individual Defendants were, and are, required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interests or benefit.

37.     Each director and officer owed to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

38.     The Individual Defendants, because of their positions of control and authority as directors and/or officers, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

39.     At all times relevant hereto, each of the Individual Defendants was the agent of the other Individual Defendants and of the Company and was at all times acting within the course and scope of such agency.

16

40.     To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company. By virtue of such duties, the Individual Defendants were required to, among other things:

a)   manage, conduct, supervise and direct the business affairs of the Company in accordance with all applicable laws;

b)   neither violate, nor knowingly permit any officer, director or employee of the Company to violate applicable laws, rules and regulations;

c)   establish and maintain systematic and accurate records and reports of the business and affairs of the Company and procedures for the reporting of the business and affairs to the Board, and to periodically investigate, or cause independent investigation to be made of, said reports and records;

d)   neither engage in self-dealing, nor knowingly permit any officer, director or employee of the Company to engage in self-dealing;

e)   ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC, its stockholders and the investing public;

f)   conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

g)   ensuring that the Company maintained an adequate system of financial

controls such that the Company's financial reporting would be true and accurate at all times; and

h)  remain informed regarding how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

41.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and its shareholders the fiduciary duties of loyalty, good faith, the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants alleged herein involves violations of their obligations as directors and/or officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware, or should have been aware, posed a risk of serious injury to the Company. The conduct of the Individual Defendants, who were officers and/or directors of the Company, has been ratified by the remaining defendants.

42.     As directors and officers of NiSource, the Individual Defendants are bound by the Company's Code of Business Conduct (the "Code"). The Code provides, in relevant part, the following:

> Our core values –fairness, honesty, integrity and trust are the focus of the NiSource Code of Business Conduct (the "Code"). We put our values into action by demonstrating them through our behaviors, decisions and interactions. To achieve our long-term business performance goals that reflect premier performance for our customers and stakeholders, we must be relentless champions and conduct

18

ourselves in a way that earns respect, supports our goals and inspires us all to do our best work. We must:

• **SERVE OUR CUSTOMERS AND OUR COMMUNITIES**. Understand the needs and expectations of our customers and stakeholders so we can do our best to meet or exceed them. Care about our customers. Give back to our communities.

• **DO THE RIGHT THING**. Work and operate safely, always. Be ethical and honest in everything we do. Protect our environment. Care about our customers. Give back to our communities. Invest in our nation's energy infrastructure and fuel long-term economic growth.

We believe that good, ethical business conduct is the foundation of a workplace where we can enjoy an atmosphere of fairness, honesty, integrity and trust, and where talented people have an equal opportunity to contribute to our strength and growth.

Our reputation ultimately rests on the good judgment and personal integrity of each of our employees, officers, Board of Directors and those with whom we do business. We believe that our core values must –at all times –guide our decisions, actions and conduct.

* * *

**OUR PROMISE**
To be responsible for our personal actions and for complying with the Code. We are responsible to read and know when, where and how to report any violation. (p. 5-7)

**USING SOLID JUDGMENT**
We will use solid business judgment in making decisions and adhere to the Company's policies and standards. If a situation arises that does not seem appropriate, we will seek the necessary resources to do what is right and will not retaliate against those who make a good faith effort to report any violation of the Code. (p. 8-9)

**MAINTAINING A POSITIVE WORK ENVIRONMENT**
We will maintain a work environment that is inclusive, safe and healthy, and free from sexual and other forms of harassment, bias and violence. (p. 10-12)

* * *

**Everyone has the power to own safety.** You have the responsibility and are expected to **Stop Work** whenever you see an employee, business partner or member of the public who is at risk of harm

* * *

**FINANCIAL REPORTING AND RECORDS**

The Company has established and is committed to maintaining a high standard of transparency, accuracy and completeness in our financial records. Financial records are formal documents representing the transaction of a business. Accounting source documents such as time sheets, expense reports, invoices, cancelled checks and sales receipts are needed to support financial records. These records serve as a basis for managing our business and are crucial for meeting obligations to employees, customers, investors and others, as well as for complying with regulatory, tax, financial reporting and other legal requirements. Each employee, regardless of position, who enters information into or participates in the drafting or completion of any business record or regulatory or financial report, is responsible for doing so in a truthful, accurate, legible, complete and timely manner.

To reduce the risk of fraud, the Company not only maintains a system of internal controls in compliance with the Sarbanes-Oxley Act of 2002 but has also adopted a strict Fraud Prevention Policy. Fraud may be committed by an individual, a group of individuals or by one or more organizations. Engaging in any scheme to defraud anyone of money, property or services is a serious offense. The Company is committed to protecting our revenue, assets and reputation in support of our accurate financial reporting. Any employee who suspects or becomes aware of fraudulent activity must immediately report such matters to their supervisor.

Anyone involved in our disclosure process is required to comply with the Company's disclosure controls and procedures and internal controls over financial reporting, to the extent relevant to your area of responsibility. This applies in particular to the Company's senior financial officers (e.g. our chief executive officer, chief financial officer and chief accounting officer). This ensures that our public reports and documents filed with the Securities and Exchange Commission (SEC) comply in all material respects with applicable federal securities laws. In addition, anyone who has a direct or supervisory authority regarding our SEC filings or other public communications concerning our business, results, financial condition and prospects, should, to the extent appropriate within their area of responsibility, consult with other Company officers and employees and take other appropriate steps regarding these disclosures with the goal of making full, fair, accurate, timely and understandable disclosures.

43.     As directors of NiSource, the Board members are bound by the Company's

Corporate Governance Guidelines. The Corporate Governance Guidelines provide, in relevant

part, as follows:

General Responsibilities of Directors.

Directors are expected to exercise their business judgment in good faith and in what they reasonably believe to be the best interests of the Company and its stockholders.

In discharging those obligations, directors should be entitled to rely on the honesty and integrity of the Company's senior management and outside advisors and auditors.

44.      During the Relevant Period, five (5) of the Individual Defendants – Bunting, Butler, DeVeydt, Jesanis and Woo – were members of the Board's Audit Committee and thus had additional responsibilities to NiSource. The Audit Committee Charter describes the duties and responsibilities of its members to:

> assist the Board in (1) monitoring the integrity of the financial statements of the Company, (2) monitoring the independent auditor's qualifications and independence, (3) monitoring the performance of the Company's internal audit function and independent auditors, (4) monitoring the compliance by the Company with legal and regulatory requirements, and (5) monitoring the Company's risk assessment process. The Committee shall directly oversee the preparation of the report required by the rules of the Securities and Exchange Commission (the "Commission") to be included in the Company's annual proxy statement.

45.      During the Relevant Period, six (6) of the Individual Defendants – Altabef, Butler, Candris, Henretta, Jesanis and Woo – were members of the Board's ES&S Committee. *See, e.g.,* NISOURCE001286. ███████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████ The ES&S Committee is particularly relevant to this Action given the Greater Lawrence Explosions, and its Charter is explicit in the responsibilities of its members:

**Purpose**

The Environmental, Safety and Sustainability Committee (the "Committee") is appointed by the Board of Directors (the "Board") of NiSource Inc. (the "Company") to assist the Board in overseeing the programs, performance and risks relative to environmental, safety and sustainability matters.

**Committee Authority and Responsibilities**
The Committee will make regular reports to the Board and will propose any necessary action to the Board. The Committee will review and reassess the adequacy of this charter annually and recommend any proposed changes to the

Board for approval. The Committee will annually evaluate the Committee's own performance.

The Committee, to the extent it deems necessary or appropriate and in furtherance of its purpose, shall:

1. Review and evaluate the Company's programs, policies, practices and performance with respect to the environment.

2. Review and evaluate the Company's programs, policies, practices and performance with respect to employee, contractor and public safety.

3. Review and evaluate the Company's programs, policies, practices and performance with respect to sustainability.

4. Review stockholder proposals related to the environment, safety and sustainability, and assess the impact on the Company.

5. Review major legislation, regulation and other external influences pertaining to responsibilities of the Committee, and assess the impact on the Company.

6. Review and evaluate the Company's programs, policies, practices and performance with respect to environmental, health and safety compliance auditing.

7. Perform other duties and responsibilities, consistent with this Charter, the Company's bylaws, governing law, the rules and regulations of the New York Stock Exchange, the federal securities laws and such other requirements applicable to the Company, delegated to the Committee by the Board.

## VI.   SUBSTANTIVE ALLEGATIONS

### A.   NiSource's History and Business

46.     NiSource is an energy holding company, which operates through two regulated business segments: Gas Distribution Operations and Electric Operations. NiSource's Gas Distribution Operations serve more than 3.5 million natural gas customers in Kentucky, Maryland, Massachusetts, Ohio, Pennsylvania, and Virginia through six distribution subsidiaries (Columbia Gas of Kentucky, Inc., Columbia Gas of Maryland, Inc., Bay State Gas Company (*i.e.,* Columbia Gas), Columbia Gas of Ohio, Inc. ("Ohio Gas"), Columbia Gas of Pennsylvania, Inc., and

Columbia Gas of Virginia, Inc.). NiSource's Electric Operations serve approximately 472,000 electricity customers in the northern part of Indiana.

47.     In 2000, when NiSource acquired Columbia Gas (and the customers, infrastructure and pipelines of that company), it still utilized over 471 miles of antiquated cast or wrought iron distribution lines, which needed immediate replacement. In addition, another 260 miles of Columbia Gas's distribution system was composed of non-cathodically protected mains. The age and lack of protective coating on these pipelines posed a significant risk to public safety. For example, even though only 2 percent of distribution mains nationwide are made of cast iron, they accounted for 41 percent of all fatalities involving gas lines between 2005 and 2017. In fact, twenty states in the U. S. have eliminated cast iron from their networks altogether.

48.     These old cast iron pipe systems are prone to failures. For example, in 2012, a NiSource gas line in Springfield, Massachusetts was punctured, resulting in an explosion that injured 21 people and caused more than $650,000 in damage to city property. Similarly, one of NiSource's other subsidiaries also experienced a natural gas line explosion in 2012. An NTSB report concluded that the rupture resulted from external corrosion that caused the pipeline's walls, which were installed in 1967 and had not been inspected or tested since 1988, to deteriorate. Likewise, another NiSource subsidiary, Ohio Gas, experienced a gas release from an improperly abandoned gas line causing $9 million in structural damage in 2015.

49.     Since NiSource's acquisition of Columbia Gas, the Massachusetts DPU has fined Columbia Gas over $100,000 for a variety of safety violations. According to a report by *The Boston Globe*, the violations included: "faulty pressure testing and response procedures, insufficiently covering new service lines, improperly classifying leaks, and breaking rules around the use of leak repair kits." Columbia Gas had a history of over-pressurization problems, with five self-reported

incidents over a six-year period from 2011 through 2016. Approximately two years before the Greater Lawrence Explosions in February 2016, Columbia Gas was fined $75,000 by the Massachusetts DPU for five violations linked to an incident in Taunton, Massachusetts stemming from an event where the pressure in the Columbia Gas' gas pipes rose dangerously high in violation of federal safety regulations. The pressure in the Columbia Gas's pipes hit alarming levels for almost a half hour during the Tauton event, violating federal pipeline safety regulations for failing to protect against accidental over-pressurization or properly maintain its equipment. The DPU rejected the Columbia Gas' excuses for the Taunton event— stating the utility didn't provide the proper protection against over-pressurization, and didn't have any records showing proper maintenance of its district regulator stations, which control pressure in the pipes. This is yet another example of the Company's failed compliance and oversight system.



### B. NiSource is a Highly Regulated Entity

51.     Given the inherent danger of natural gas service and delivery, NiSource operated in a highly regulated environment with both federal and state laws and regulations governing the Company's conduct. These laws required strict adherence due to the high risk of loss of life and property which could result from an accident involving natural gas.

52.     The Natural Gas Pipeline Safety Act of 1968 ("NGPSA") established minimum safety standards for the transportation of natural gas and other gases by pipeline. The Department of Transportation ("DOT") thereafter issued regulations designed to protect against the risks of loss of life and property posed by pipeline transmission and pipeline facilities. These regulations impose criminal penalties for knowing and willful violations of any part of the regulations promulgated by the DOT for the NGPSA. Subsequent acts of Congress and federal regulations have amended and expanded the obligations of a natural gas operator. These regulations are collectively referred to by their location in Part 192 of Title 49 of the Code of Federal Regulations, Subparts A through M ("Part 192").

53.     In 2006, Congress passed the Pipeline Inspection, Protection, Enforcement and Safety Act, which directed the Pipeline and Hazardous Materials Safety Administration ("PHMSA") (PHMSA is an agency within the DOT) to "prescribed minimum standards for integrity management programs for distribution pipelines." In 2009, PHMSA promulgated regulations which require natural gas operators to "develop and implement" a Pipeline Integrity Management System by no later than August 2, 2011.

54.     Part 192 requires operators to "prepare and follow for each pipeline, a manual of written procedures for conducting operations and maintenance activities." This is commonly known as an operation and maintenance manual or O&M Manual. Subsection 605(b)(5) of Part 192 requires the O&M Manual to include a procedure for "starting up and shutting down any part of a pipeline in a manner designed to assure operation within the [...] limits prescribed" in order to "provide safety during maintenance operations." Subpart L of Part 192 also requires a natural gas operator to "keep records necessary to administer the procedures under §192.605." The records required to be kept and made available to operating personnel include, "construction records, maps

25

and operating history."

55.     The Company maintained a defective and inadequate system, and the Board failed to create policies and procedures to ensure that critical safety and engineering materials and information were available to operating personnel. *See* Ex. C, Plea Agreement at ¶¶11-13; 22-27. In fact, the required records were not readily available in a Company-wide system which all employees and contractors could access when performing complicated and potentially dangerous tasks like the replacement of a natural gas main, and were available only in certain binders in Company vehicles.

56.     By no later than September 2015, Company management was well aware of the particular dangers associated with underground control pressure lines. According to the U.S. Government's Information filing on February 26, 2020 ("Criminal Information"), on September 2, 2015, NiSource and Columbia Gas internally disseminated Operational Notice ("ON") 15-05, entitled "Below Grade Regulator Control Lines: Caution When Excavating Near Regulator Stations or Regulator Buildings." Ex. C at ¶23. The impetus for ON 15-05 was a "near miss" experience involving another NiSource company outside of Massachusetts where a construction crew, "excavating to repair" a gas leak near a Regulating Station, came close to hitting a control line and was unaware of its purpose and importance. *Id.*

57.     The stated objective of ON 15-05 was two-fold: "l. Bring awareness to Company and Contractor employees regarding the existence and importance of regulator control lines ...that help to provide critical sensing information for the accurate monitoring and control of outlet pressure into the Company's piping systems..." and "2. Set forth required actions for future Company excavations." *Id.* at ¶24.

58.     ON 15-05 described what Reg. Station control lines did, and said control lines:

... sense the outlet pressure of the regulator. Based on the pressure sensed through the control line, the regulator valve will open or close to control the downstream pressure at the set point of the regulator.

*Id.* at ¶25.

59.    ON 15-05 further warned that a broken or disrupted control line could lead to a "catastrophic event:"

If a control line breaks, the regulator will sense a pressure loss, causing the valve to open further, resulting in an over pressurization of the downstream piping system, which may lead to a catastrophic event. The same result occurs if the flow through the control line is otherwise disrupted ( e.g., control line valve shut off, control line isolated from the regulator it is controlling).

*Id.* at ¶26.

60.    Finally, the "Required Action" from ON 15-05 to the Company's employees was that:

any Company excavations within the footprint of a [Reg. Station] and/or within 25 feet of a station building or fence shall only proceed with M&R [Metering & Regulation] standing by throughout the excavation ...

*Id.* at ¶27.

61.    In short, over-pressurization was a known risk which could result in a "catastrophic event," but on the Individual Defendants' watch, the Company never prepared or implemented any written procedure to ensure that belowground control lines were accounted for, and, if necessary, removed or relocated. The Criminal Information states that Columbia Gas "relied upon an informal practice of encouraging verbal communications among members of Field Engineering, Construction and M&R when excavation took place within the footprint of a Reg. Station." Ex. C at ¶28.

62.    The Individual Defendants "encouraged" the informal practice of "verbal communications" among operating personnel rather than establishing appropriate safety protocols

and procedures, in contravention of their legal obligations under Part 192 and in breach of their fiduciary duties to NiSource. *See* Ex. C at ¶¶28; 53; 89.

### C.  NiSource's Public Statements

63.     The Company's SEC filings clearly indicate that the Board was aware of the serious risks associated with electricity and natural gas services. For example, the Company's Relevant Period Annual Reports on Form 10-K contain risk disclosures similar to the following:

> **Distribution of natural gas, and the generation, transmission and distribution of electricity involve numerous risks that may result in incidents and other operating risks and costs.**
>
> Our gas distribution activities, as well as generation, transmission, and distribution of electricity, involve a variety of inherent hazards and operating risks, such as gas leaks, downed power lines, other incidents, third-party damages, large scale outages, and mechanical problems, which could cause substantial financial losses. In addition, these risks could result in serious injury or loss of life to employees and the general public, significant damage to property, environmental pollution, impairment of our operations, adverse regulatory rulings and reputational harm, which in turn could lead to substantial losses for us. The location of pipeline facilities, or generation, transmission, substation and distribution facilities near populated areas, including residential areas, commercial business centers and industrial sites, could increase the level of damages resulting from such events. These activities may subject us to litigation or administrative proceedings from time to time, which could result in substantial monetary judgments, fines, or penalties against us, or be resolved on unfavorable terms. The occurrence of such events could adversely affect our financial position and results of operations. In accordance with customary industry practice, we maintain insurance against some, but not all, of these risks and losses.

### D.  The Board's Relevant Period Meetings and Conduct

64.     The Company's document production made to Plaintiff pursuant to its §220 demand provides ample evidence that the Individual Defendants were provided with numerous "red flags" regarding the serious nature of safety failures at the Company's subsidiaries. Likewise,

28

instead of fulfilling their fiduciary duties to the Company, the documents show that the Individual Defendants chose to disregard these "red flags" with disastrous consequences. In significant part, the Individual Defendants prioritized profits at the expense of providing adequate funding for public safety.

65.    On January 27, 2016, a joint meeting for the Board and the Company's Finance Committee was held in Palm Beach, Florida. The following Individual Defendants attended this meeting: Thompson, Hamrock, Candris, Woo, Henretta, Kabat, and Jesanis. ████████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
███████ ████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████
███    ████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

67.    On March 21, 2016, the ES&S Committee held a meeting in Merrillville, Indiana.

[3]    https://abc6onyourside.com/news/local/deadly-house-explosion-in-tuscarwas-county.

[4]    https://www.npr.org/2018/08/08/636779692/california-company-reaches-119-5-million-settlement-over-massive-gas-leak

Defendants Thompson, Hamrock, Candris, Woo, Henretta, and Jesanis were among those in attendance. During this meeting, ███████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████

68.     On October 24, 2016, a meeting of the ES&S Committee was held in Pittsburgh, Pennsylvania. Among those in attendance were defendants Henretta, Jesanis, Woo, Candris, Thompson and Hamrock. NISOURCE000380. ████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████

69.     On January 26, 2017, a meeting of the ES&S Committee was held in Williamsburg, Virginia. Among those in attendance at this meeting were defendants Henretta, Jesanis, Woo, Candris, Thompson and Hamrock. NISOURCE000499. ████████████████████████████

███████████████████████████████████████████████████████

---

[5]     https://www.fox43.com/article/news/local/contests/columbia-gas-of-pennsylvania-releases-statement-regarding-littlestown-incident/521-8f992a65-73b4-46b1-a793-0a7d213e206b



70.     On October 24, 2017, a meeting of the Board was held in Boston, Massachusetts.

Among those in attendance at this meeting were defendants Altabef, Butler, Candris, DeVeydt,

Hamrock, Henretta, Jesanis, Kabat, Thompson and Woo. NISOURCE000903.

71.     That August 2015 *Boston Globe* article, published over two years before the

October 24, 2017 Board meeting, reported as follows:

> The state's aging natural gas pipelines are riddled with about 20,000 potentially
> dangerous and environmentally damaging leaks, many decades old, according to the first
> statewide analysis of the problem in Massachusetts.
>
> Detailed maps of the leaks became available this week as a result of a new state law
> requiring utility companies to report the location and age of all their known gas leaks,
> which according to one estimate have cost ratepayers more than $1 billion.
>
> "The leaks are potentially explosive, kill trees, harm human health, and release an
> extraordinarily destructive greenhouse gas," said Audrey Schulman, president of the

Home Energy Efficiency Team, a Cambridge nonprofit that mapped the leak data submitted by the utilities. "To add insult to injury, we ratepayers have to pay for the lost gas."

The data show that Cohasset has more leaks per household that uses gas than any other municipality in Massachusetts, while Weymouth has more leaks than any other town when measured by the amount of streets.

Boston, which has 9 percent of the pipes in Massachusetts that are losing gas through ruptures, more than any other city or town, also has the oldest leaks in the state. One leak not far from Fenway Park has been seeping noxious emissions for 30 years, the data show.

Schulman said there may be even more leaks than the utilities are reporting. Last year, her organization tested for gas leaks in Somerville and found nearly 500 of them — almost three times the number reported by Eversource Energy and National Grid, the region's main gas suppliers, she said.

Officials at the utility companies said they're working as fast as possible to plug the leaks. The gas releases an odor similar to rotten eggs to make the leaks easy to detect.

The leaks are often the result of the corrosion of aging cast-iron pipes, some more than a century old, or construction accidents.

By law, the utilities are required to repair immediately leaks that pose a risk of explosion. A state law passed last year requires utilities to repair minor leaks on streets that are under construction, near a school zone, or around trees that appear to be dying.

The utilities used to allow those leaks to seep indefinitely, because they didn't see them as an imminent threat.

Caroline Pretyman, a spokeswoman for Eversource, said her company monitors all its leaks and has an accurate tally of them.

"There is a complex and rigorous system of gas leak surveys that are undertaken every year," she said.

In the coming years, Eversource plans to replace old pipes at a rate of 50 miles per year, with the goal of eliminating pipes prone to leaks within 25 years.

This year, the company expects to repair about 30 miles of 390 miles of cast-iron pipelines, Pretyman said.

Danielle Williamson, a spokeswoman for National Grid, said the company plans to spend $2.4 billion over the next five years to repair its pipes, with the goal of replacing all its leak-prone pipes in 20 years. Since 2010, the company has replaced more than 630

miles of pipes.

"National Grid's natural gas system is safe and operating normally," she said. "We take the safety of the public, our communities, and our employees very seriously."

Natural gas explosions, including one last year that injured about a dozen people in Dorchester, have raised safety concerns about the leaks.

But repairing them also yields economic and environmental benefits.

A federal study commissioned two years ago by Senator Edward Markey found that Massachusetts residents paid as much as $1.5 billion from 2000 to 2011 for gas they never used because of leaks.

Natural gas is mainly composed of methane, which traps heat and is about 25 times more powerful than carbon dioxide, meaning small amounts can have a significant impact on global warming.

In an effort to blunt the impact of methane, the Obama administration this week released a plan to cut emissions of the gas by nearly half nationwide over the next decade.

In January, a study by scientists at Harvard University found that methane has been leaking from pipes, storage facilities, and other sources in the Boston area by as much as three times greater than previously estimated. The leaked gas is enough to heat as many as 200,000 homes a year and is valued at $90 million a year, the authors said.

The maps that became available this week show Cohasset with 205 leaks, one for every six homes that use gas, including a leak that is 24 years old.

By comparison, that data reveal one leak for every 250 homes that use gas in Easton, a town with a similar percentage of gas-heated homes.

"Wow," said Christopher G. Senior, town manager of Cohasset, upon learning that his South Shore community of 8,000 residents has such a large number of leaks. "It's very surprising. We've had no explosions or fires."

He said National Grid next month will replace nearly 2,000 feet of steel gas mains that were built in 1928.

"It's going to be important for National Grid to explain this to us," Senior said.

In nearby Weymouth, the maps show 657 leaks, nearly three leaks for every mile of road, compared with one leak for every five miles in Peabody, which has a similar percentage of gas-heated homes.

"This is definitely concerning," said Mayor Susan Kay of Weymouth, which has 50,000

33

residents.

In Boston, where the data show 1,853 leaks, officials said they now hold monthly meetings with National Grid to review repairs.

They praised the new law for providing a more detailed portrait of the problem in Boston.

"At least we now have an understanding of the extent of the leaks," said Austin Blackmon, the city's environmental chief. "Now the city can react to it."

72.    To the extent that the Board argues it was somehow blissfully unaware of the serious, heightened risks of gas leaks and explosions in Massachusetts when the *Boston Globe* article was originally published in 2015, it was made aware of these risks in connection with the "Massachusetts Update" provided during the October 24, 2017 Board meeting.

73.    The materials cited above are precisely the type of "red flags" that provided the Individual Defendants with information regarding the Company's safety problems, particularly with respect to its Massachusetts natural gas operations, that they had a ***duty*** to act on. The Company's SEC filings and other public statements, as well as its corporate governance documents all stress the importance of following federal and state safety protocols -- these are the definition of "mission critical" areas for oversight. The Board materials cited above show that the Individual Defendants essentially ignored these mandates and operated with a "business as usual" approach, including by allowing verbal communications between employees to substitute for a Company-wide information management system. The Individual Defendants failed to remedy the identified safety problems and permitted the Company to operate without an integrated safety system designed to mitigate or eliminate public safety risks. This led to disastrous results.

74.    On the day after the Greater Lawrence Explosions, September 15, 2018, the Board held a special meeting which was attended by defendants Altabef, Bunting, Butler, DeVeydt, Hamrock, Henretta, Jesanis, Kabat, Thompson and Woo. NISOURCE002566. The Board spoke

34

for one hour by telephone, ███████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████

75.     On October 22, 2018, the ES&S Committee held a meeting in Columbus, Ohio, which was attended by current Committee members, defendants Altabef, Butler, Candris, Henretta and Woo, as well as non-Committee members, defendants Thompson, Kabat, Bunting and Hamrock. NISOURCE002625. Also present were numerous senior executives, including the CFO, Chief Restoration Officer, Chief Legal Officer, and, *inter alia*, senior executives from Audit, Environmental and Training, Pipeline Safety. *Id.* ████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████

██      ███████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

_____

[6]      GIS is an acronym for "Graphical Information System," which is a framework for gathering, managing and analyzing data. GIS integrates many types of data, analyzes spatial locations and organizes layers of information into visualizations using maps and 3D scenes. This type of system is a necessary tool which integrates a pipeline operator's operations, including location data for shutoffs, etc. into one place where any employee may access it. Such a system was among the recommendations from the NTSB report and should have been in place before the Greater Lawrence Explosions. Such a system likely would have prevented the event.

[7]      The ES&S Committee's duties required them to "review and evaluate the Company's programs, policies, practices and performance with respect to employee, contractor and public safety."

36

A report of the ES&S Committee of this meeting would later be presented to the full Board (despite the fact that each Board member who was not on the ES&S Committee attended this meeting) on October 23, 2018. NISOURCE002668.

78.     The Board met on Tuesday, January 29, 2019 at the Ritz Carlton Beach Resort in Naples, FL. NISOURCE002738. Defendants Altabef, Bunting, Butler, Candris, Hamrock, Henretta, Jesanis, Kabat, Thompson and Woo were in attendance, in addition to numerous other senior executive officers of NiSource. *Id.*

79.     NiSource completely lacked a pipeline SMS system at Columbia Gas before the Greater Lawrence Explosions due solely to the misconduct of the Individual Defendants, despite their actual knowledge of safety issues at Columbia Gas (and other natural gas subsidiaries). RP 1173 was developed in June 2014 and made available, for free, by the American Petroleum

Institute at that time.[8] The Individual Defendants were required, by their fiduciary duties, the Company's public statements regarding the priority of customer safety, and (with respect to the ES&S Committee members) by the ES&S Committee Charter, to "review and evaluate the Company's programs, policies, practices and performance with respect to employee, contractor and public safety." *See* ¶45. An integrated pipeline SMS system is just the type of program that experts developed to prevent the types of risks that led to the Greater Lawrence Explosions. In fact, NiSource's Virginia subsidiary had implemented an SMS system in 2015, more than 3 years before the Greater Lawrence Explosions. Ex. B at 28. And despite NiSource itself being "among the first natural gas companies to embrace RP 1173" at its Virginia subsidiary, the Individual Defendants failed to implement a similarly compliant pipeline SMS system at Columbia Gas for the Company's Massachusetts customers until after the Greater Lawrence Explosions.



---

*See* https://pipelinesms.org/rp-1173.





82.     On March 18, 2019, the ES&S Committee held a meeting which was attended by

defendants Altabef, Butler, Candris, Thompson, Kabat and Hamrock. ████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████ NiSource

eventually agreed to fully implement a pipeline SMS system at Columbia Gas by order of the

Massachusetts DPU.[9]

       83.     Following this ES&S Committee meeting, the full Board met. NISOURCE002955.

In attendance were defendants Altabef, Bunting, Butler, Candris, DeVeydt, Hamrock, Henretta,

Jesanis, Kabat, Thompson and Hamrock, along with many senior executives. *Id.* ████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

███     ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

---

[9]     Commonwealth of Massachusetts Department of Public Utilities Consent Order, D.P.U.
18-PL-03, November 30, 2018.

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████

85.     The Individual Defendants' failure to implement such a compliance system, particularly where, as here, the Company operates in the midst of "mission critical" regulatory compliance risk is indefensible. The distribution of natural gas is the very definition of a highly regulated environment and the Individual Defendants' fiduciary duties required them to rigorously exercise their oversight function and ensure a robust and effective oversight system. They failed to do so until after the deadly Greater Lawrence Explosions. In fact, the post-explosion books and records demonstrate the Individual Defendants' belated attempt to fulfill their fiduciary duties and provide the required active oversight.

86.     █████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

████████████████████   These actions constitute a breach of the Individual Defendants' fiduciary duties.

### E.  September 13, 2018 Greater Lawrence Natural Gas Explosions

87.     On September 13, 2018, a series of 141 fires in as many as 40 homes and 5 explosions occurred in Lawrence, Andover, and North Andover, Massachusetts related to

Columbia Gas's distribution of natural gas. The Greater Lawrence Explosions led to one fatality, a number of serious injuries, and massive property damage, while forcing approximately 30,000 people to evacuate their homes. The Greater Lawrence Explosions caused more than $1 billion in damages to NiSource. The Greater Lawrence Explosions also resulted in the Massachusetts Governor's Office declaring a state of emergency and authorizing Eversource, another utility company, to coordinate the restoration of gas services. The Greater Lawrence Explosions affected more than 7,500 gas meters, and some customers' services were not restored until December 2018.

88.     The Greater Lawrence Explosions prompted investigations by federal and state government authorities and regulatory agencies. As discussed below, the Massachusetts U.S. Attorney's office investigation would lead to criminal charges against NiSource and an eventual guilty plea.

89.     On October 11, 2018, the NTSB issued a preliminary public report, which found that Columbia Gas caused the Greater Lawrence Explosions while doing pipeline replacement work on its natural gas distribution system in Lawrence, Massachusetts due to a defective and inadequate construction work package prepared by Columbia Gas. Notably, the work package, ***which was not prepared by a professional engineer,*** failed to instruct the crew to deactivate underground pressure sensors from the old pipeline when doing their work.[10] As a result, the

---

[10]     Specifically, the work package failed to include consideration of the existence of regulator-sensing lines within the scope of the work and this omission was not identified by the "constructability review." Constructability reviews are a recognized and generally accepted good engineering practice for the execution of professional design services and are intended to provide an independent and structured review of construction plans and specifications to ensure there are no conflicts, errors, or omissions. The review should be performed by qualified professionals to identify deficiencies and incorporate improvements into the construction documents. Many jurisdictions also require that plans be approved (*i.e.,* "sealed") by a professional engineer licensed to perform engineering in the jurisdiction. The NTSB concluded that "had accurate alignment sheets with comprehensive system information been available and used during the construction

sensors automatically pumped in more gas than the maximum allowed creating a highly dangerous condition. Columbia Gas's monitoring system in Columbus, Ohio received two high-pressure alarms just before the Greater Lawrence Explosions, but the monitoring center had no safety mechanism in place to open or close the valves. Significantly, the "NTSB investigators also determined that had [Columbia] Gas adequately performed management of change and placed personnel at critical points along the system, [Columbia] Gas could have immediately addressed the issue and mitigated the consequences of the event."[11]

90. On November 14, 2018, the NTSB issued five urgent safety recommendations based on its ongoing investigation concerning the Greater Lawrence Explosions. *See* Ex. D. Typically, the NTSB will wait until its investigation is complete to issue its findings, however, the NTSB said, "In this investigation, the NTSB issued five urgent safety recommendations to address this imminent threat to life safety created by the conditions discovered thus far in the agency's ongoing investigation of the accident." Notably, four of the five safety recommendations were issued directly to NiSource, not the operating subsidiary and related directly to the utter lack of a reasonable monitoring and reporting system for "mission critical" issues like safety oversight.

91. First, the Board failed to ensure that "all applicable departments review construction documents for accuracy, completeness and correctness, and that documents or plans be sealed by a professional engineer prior to work commencing." Ex. D at 7. The NTSB concluded that a comprehensive constructability review, which would require all departments to review each

---

project, engineers and work crews would have been able to identify the regulator-sensing lines and ensure their relocation prior to abandoning the pipeline main."

[11] According to reporting in *Popular Mechanics,* until four years ago, a technician from the Meter and Regulation Department would have been assigned to the site to monitor pressure readings on the affected section of the gas main, but Columbia Gas, for undisclosed reasons, ended this practice.

project, along with the seal of approval from a professional engineer, would likely have identified the omission of the regulator-sensing lines, thereby preventing the error that led to the accident. This was simply not required by NiSource's policies, which were under the purview of the ES&S Committee.

92.     Second, NiSource was required to "review and ensure that all records and documentation of your natural gas systems are traceable, reliable, and complete." *Id.* This was impossible under the safety and compliance system implemented by the Individual Defendants at Columbia Gas which relied on verbally relaying information from one employee to another and by placing critical information on location of safety control lines in a binder located in the work vehicle of certain employees. As the NTSB's News Release accompanying the Preliminary Report states, "the NTSB believes had accurate alignment sheets with comprehensive system information been available and used, engineers and work crews would have been able to identify the regulator-sensing lines and ensured their relocation prior to abandoning the pipeline main."[12] *See* Ex. E. The integrated SMS system adopted post-explosion at Columbia Gas (and which had been in place at the Company's Virginia subsidiary) is designed to remedy this deficiency.

93.     The third and fourth urgent safety recommendations are interconnected. Third, NiSource was urged to "apply management of change process to all changes to adequately identify system threats that could result in a common mode failure." The fourth required the "development and implementation of control procedures during modifications to gas mains to mitigate risks identified during management of change operations, with gas main pressures continually monitored during modifications and assets placed at critical locations to immediately shut down

---

[12]     "NTSB Issues 5 Urgent Safety Recommendations as Investigations of Merrimack Valley Gas Explosions, Fires Continues." NTSB Office of Public Affairs. November 15, 2018. Available: https://www.ntsb.gov/news/press-releases/Pages/NR20181115b.aspx

the system if abnormal operations are detected."

94.     These final two "urgent" items relate to control procedures for the technical term -
- management of change. "Management of Change" (or "MOC") is a best practice used to ensure
that safety, health, and environmental risks and hazards are properly controlled when an
organization makes changes to facilities, operations or personnel. Having a properly implemented
MOC policy in place when implementing changes can help ensure that new hazards aren't
introduced and the risk levels of existing hazards aren't being increased. Inadequate MOC on the
other hand has the potential to increase risks to the health and safety of employees and the
environment. Performing an MOC is *required* under the Occupational Safety and Health
Administration's ("OSHA") Process Safety Management standard, and NiSource's failure here is
evident. Because NiSource was shuffling different employees (and engineers) on and off of the
South Union Street pipeline replacement project, and those employees did not all have the same
level of knowledge regarding the location of the safety control lines (and that critical information
was not found in a pipeline SMS database or GIS system), the safety risks due to reliance on verbal
communications and knowledge only in the possession of certain employees was significant and
simply not appreciated by NiSource. ████████████████████████████
████████████████████████████████████████████
██████████████████████

95.     In sum, the NTSB's four urgent safety recommendations to "address the imminent
threat to life safety created by the conditions" at NiSource all related to specific, identifiable
failures by the Individual Defendants with respect to their creation and oversight of safety and
compliance policies for NiSource. *See* Ex. E.

96.     Immediately after the Greater Lawrence Explosions, Massachusetts Governor

Charlie Baker declared a state of emergency for the area while expressing frustration with the Company. At a press conference, Gov. Baker stated, "on a number of very significant issues, we heard one thing, then something else happened." Likewise, at a hearing before Congress, U.S. Senator Ed Markey stated "At every step of the process, there was a chance to avoid this disaster. Instead of choosing safety, you chose savings.  Instead of choosing to do things the right way, you chose to do things the easy way and the result was disaster."

████  ██████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████

98.     The NTSB's initial conclusions would subsequently be upheld when the NTSB issued a final report, adopted September 24, 2019, which concluded that "the probable cause of the over pressurization of the natural gas distribution system and the resulting fires and explosions was Columbia Gas of Massachusetts' weak engineering management." Ex. B at vii. Furthermore, "contributing to the accident was a low pressure natural gas distribution system designed and operated without adequate overpressure protection." *Id*. The Company's culpability was never seriously in doubt, and Columbia Gas provided a statement to the press on February 26, 2020 which said that it took "full responsibility for the tragic events of September 13, 2018."

### F.  NiSource Pleads Guilty to Criminal Violations of Pipeline Safety Laws

99.     Eighteen months after the Greater Lawrence Explosions, on February 26, 2020, Columbia Gas agreed to plead guilty to criminal violations of 49 U.S.C. §§60123(a), 60118(a); and 49 C.F.R. §§192.605(a) and 192.605(b)(5) for a "Knowing and Willful Failure to Prepare and Follow a Procedure for the Starting Up and Shutting Down of a Pipeline", arising from the conduct of its wholly-owned subsidiary, Columbia Gas." *See* ¶¶52-62. The terms of the DPA were onerous,

devastating the value of NiSource's Columbia Gas subsidiary and forcing it to completely exit the gas business in Massachusetts.

100. The terms of the DPA included:

a. NiSource's agreement to use reasonable best efforts to sell CMA [Columbia Gas] or CMA's gas distribution business, to a qualified third-party buyer ... and upon the completion of any such sale, to cease and desist any and all gas pipeline and distribution activities in the District of Massachusetts;

b. In the event that CMA or its gas distribution business is sold within CMA's three (3) year term of probation, NiSource's agreement to forfeit and pay a monetary penalty equal to the total amount of any profit or gain from the sale of CMA or CMA's gas distribution business;

c. NiSource's prior voluntary payments of restitution to the victims of the Event including, but not limited to, payments to the individuals, businesses and municipalities affected;

d. NiSource's agreement to seek to resolve all pending civil claims, including NiSource's agreement to seek to settle the claims filed by the Massachusetts DPU;

e. NiSource's acknowledgement that, based on the allegations in the CMA Criminal Information, the Government has sufficient basis to allege that NiSource is responsible for CMA's conduct as alleged in the CMA Criminal Information; and

f. NiSource's commitment to fulfill all of the terms of this Agreement.

*See* Ex. A, Deferred Prosecution Agreement at ¶4.

101. In addition to paying a fine of $53 million, NiSource was (i) placed on probation for three years (or until a sale of Columbia Gas was completed); (ii) required to "implement and adhere to each of the recommendations from the [NTSB]" related to the Greater Lawrence Explosions in each of its "subsidiaries involved in the distribution of gas through pipeline facilities in Massachusetts, Indiana, Ohio, Pennsylvania, Maryland, Kentucky, and Virginia" (Ex. A at ¶11); and (iii) required to employ at its own expense, an in-house monitor to oversee NiSource's "compliance with the recommendations of the NTSB and applicable laws and regulations" who will report monthly to government officials. Significantly, NiSource remains subject to possible

prosecution for any violation of the terms of the DPA (Ex. A. at ¶13).

102.    Importantly, the guilty plea resulted in the largest criminal fine ever imposed under the Federal Pipeline Safety Act. The DPA is a striking indictment of the Individual Defendants' failure to implement a reasonable monitoring and reporting system for critical issues of public safety: the Company "[f]rom in or about 2015 through on or about September 13, 2018...by and through the actions of its employees," and "through a pattern of flagrant organizational indifference, knowingly and willfully violated a minimum safety standard for the starting up and shuttering of any part of a distribution pipeline." Furthermore, Columbia Gas "knowingly and willfully failed to prepare and follow procedures to remove and relocate regulator control lines on the South Union Project to assure operation of the South Lawrence LP System within the Maximum Allowable Operating Pressure and safety during maintenance and operations." Ex. C at ¶95.

103.    Details provided in the Criminal Information (attached hereto as Ex. C) paint a stark picture of NiSource's repeated and ongoing failures in adopting adequate safety standards and safeguards in its gas operations. Included among those failures: (i) Columbia Gas "did not maintain consistent and reliable records of control lines" (¶42); (ii) Columbia Gas "deliberately chose not to include consistent and reliable information about the location of control lines in GIS and instead relied upon the patchwork of records...that were often outdated and unreliable" (¶¶47-48); (iii) despite concerns regarding the GIS and "accuracy of gas pressure models for Field Engineers...[Columbia Gas] chose not to change its practice and failed to include" necessary information because of "the substantial cost involved." (¶48); (iv) Columbia Gas and its "Field Engineering's evaluation of risk focused on the actual occurrence of prior events affecting pipeline integrity" rather than the known "near-miss" involving control lines within NiSource (¶71); and

(v) Columbia "did not prepare and follow, nor even contemplate, a formal written procedure for the removal of the control lines [that it] knew was needed to prevent an over-pressurization and assure operation within [guidelines]" (¶88).

104.    Coincident with the DPA, NiSource announced that it would sell Columbia Gas' assets to Eversource, a competing natural gas provider. The Company also agreed to give the government any profits from the sale of Columbia Gas to Eversource and to subject its operations to monitoring during a three year period to ensure compliance with federal and state safety regulations. NiSource also retained future and ongoing liabilities associated with Columbia Gas "arising out of or related to the Greater Lawrence Incident" including, among other things, any losses arising from or related to "any litigation, demand, cause of action, claim, suit investigation..." *See* Asset Purchase Agreement, Dated as of February 26, 2020 (Section 2.1 (d) "Excluded Liabilities").

**G.    The Director Defendants Violated Section 14(a) of the Exchange Act and SEC Rule 14a-9, and Breached their Fiduciary Duties of Disclosure By Causing the Company to File Materially Misleading Proxy Statements**

105.    The Director Defendants violated Section 14(a) of the Exchange Act and SEC Rule 14a-9 by causing NiSource to issue proxy statements in 2017 and 2018 that failed to disclose that: (1) NiSource was knowingly and willfully violating state and federal minimum pipeline safety standards; (2) the Company had ignored a "near miss" that occurred at one of its pipeline subsidiaries and failed to implement preventative practices and risk mitigation policies to protect public safety; (3) the Company did not maintain consistent and reliable records and necessary information for pipeline safety; and (4) the Company exhibited a flagrant organizational indifference towards minimum gas pipeline safety standards.

*NiSource's 2017 Proxy Statement*

106.    On April 5, 2017, defendants Hamrock, Candris, Woo, Henretta, Butler, Kabat, Jesanis, Altabef, Bunting and DeVeydt caused NiSource to file its annual proxy statement (the "2017 Proxy Statement") in connection with the 2017 annual stockholders meeting to be held on May 9, 2017. In the 2017 Proxy Statement, these defendants solicited stockholder votes to, among other things, (i) re-elect themselves to the Board; (ii) approve executive compensation; and approve the frequency of future advisory votes on executive compensation. With each of these solicited votes, these defendants issued materially false or misleading proxy statements.

107.    With respect to the Board's duties concerning its oversight of the Company's risks the 2017 Proxy Statement stated:

**Board Oversight of Risk**

The Board takes an active role in monitoring and assessing the Company's strategic, compliance, operational and financial risks. The Board administers its oversight function through utilization of its various committees. The Company's Risk Management Committee, which consists of members of our senior management, is responsible for oversight of the Company's risk management process. Senior management regularly provides reports on our risks to the Board, the Audit Committee and the Board committees that oversee the applicable risks. Additionally, the Audit Committee discusses with management and the independent auditor the effect of regulatory and accounting initiatives on the Company's financial statements and is responsible for review and evaluation of the Company's major risk exposures and the steps management has taken to monitor and control such exposures. The Audit Committee reviews and assesses the adequacy of the Company's Risk Management Committee Charter annually, amending it as appropriate. In addition, the Compensation Committee, the Environmental, Safety and Sustainability ("ESS") Committee, the Finance Committee and the Nominating and Governance Committee are each charged with overseeing the risks associated with their respective areas of responsibility.

108.    Further, regarding the Audit Committee the 2017 Proxy Statement stated:

*Audit Committee*

- reviewing and evaluating the Company's major risk exposures, including cybersecurity and supplier risks and the steps management has taken to monitor

and control such exposures including discussion of the Company's risk assessment and risk management policies; and

- overseeing the Company's compliance with legal and regulatory requirements.

109.   And specifically regarding the ES&S Committee, the 2017 Proxy Statement detailed the breadth of its duties:

### Environmental, Safety and Sustainability Committee

The ESS Committee met five times during 2016. The ESS Committee assists the Board in overseeing the programs, performance and risks relative to environmental, safety and sustainability matters. Its responsibilities include, among others:

- evaluating the Company's environmental and sustainability policies, practices and performance;

- evaluating the Company's safety policies, practices and performance relating to our employees, contractors and the general public;

- reviewing and assessing stockholder proposals related to the environment, safety and sustainability;

- reviewing and evaluating the Company's programs, policies, practices and performance with respect to health and safety compliance auditing; and

- assessing major legislation, regulation and other external influences that pertain to the ESS Committee's responsibilities and assessing the impact on the Company.

110.   Those representations in the Proxy Statements conveyed that the Board: (i) maintained sufficient compliance, risk controls, review, and reporting programs to identify and address misconduct; (ii) was unaware of existing material risks that could affect the Company; (iii) had policies to deter unnecessary or "undue risk-taking," including compensation and ethics policies, (v) maintained adequate internal controls, and (v) maintained risk management practices with "[e]xtensive Board oversight of risk management." However, as alleged herein, these representations were materially false and misleading and failed to disclose serious deficiencies in the Company's practices and individual Board member's inability to discharge their fiduciary

duties, particularly members of the ES&S Committee.  *See* ¶¶45; 67-69; 75-77; 79; 82-85.

111.    With respect to director elections, the 2017 Proxy Statement stated that the Board unanimously recommended the re-election of all then current Board members despite the undisclosed failings of the Board and its Committees' oversight and monitoring of NiSource's pipeline safety processes and procedures.

112.    The 2017 Proxy Statement harmed NiSource by interfering with proper governance concerning stockholders' informed voting for directors. As a result of the false or misleading statements in the 2017 Proxy Statement, NiSource stockholders voted to re-elect defendants Hamrock, Candris, Woo, Henretta, Butler, Kabat, Jesanis, Altabef, Bunting, and DeVeydt.

113.    The 2017 Proxy Statement also urged stockholders to approve an advisory resolution regarding compensation paid to named executives. In support of the requested approval, the 2017 Proxy Statement said:

> In considering this proposal, stockholders may wish to consider the following factors that demonstrate our commitment to maintaining a robust compensation program:
>
> • Compensation is closely tied to both corporate and individual performance;
>
> • Annual and long-term incentive compensation opportunities are contingent on the Company achieving pre-established goals;
>
> • Total compensation packages are competitive with those offered by members of the Company's Comparative Group;
>
> • Perquisites are appropriately limited in number and modest in dollar value; and
>
> • Our compensation program does not create incentives for behaviors that create material risk to the Company.
>
> As discussed in the Executive Compensation section of this Proxy Statement, the Compensation Committee and the Board believe that the Company's executive compensation program fulfills the objectives of its compensation philosophy in a prudent and effective manner.

114.    Those statements conveyed that NiSource's compensation system encouraged proper risk management and advanced long-term shareholder value. In reality, NiSource's compensation system actually encouraged – and rewarded – extreme risk-taking and illegal practices. The Individual Defendants knew or should have known that their own actions (and inaction, with respect to compliance oversight systems and monitoring) breached their fiduciary duties to the Company and exposed it to significant and material risks and liability. This same conduct and the resulting violations of federal and state laws, as well as failures to comply with NiSource's obligations to protect public safety also went undisclosed.

115.    Under this false impression, numerous NiSource shareholders voted in support of millions in compensation to NiSource executives in 2017, without the benefit of material information regarding these executives' continued and ongoing breaches of fiduciary duties, which resulted in violations of federal and state laws and criminal charges as reflected in the DPA, and the related concealment of such practices and deficiencies, and their continued and ongoing failure to reform the Company's compensation structures to ensure they did not promote this widespread illegal activity at NiSource.

### NiSource's 2018 Proxy Statement

116.    On April 6, 2018, defendants Hamrock, Candris, Woo, Henretta, Butler, Kabat, Jesanis, Altabef, Bunting, and DeVeydt caused NiSource to file its annual proxy statement (the "2018 Proxy Statement") in connection with the 2018 annual stockholders meeting to be held on May 8, 2018. In the 2018 Proxy Statement, these defendants solicited stockholder votes to, among other things, (i) re-elect themselves to the Board; and (ii) approve executive compensation. With each of these solicited votes, these defendants issued materially false or misleading proxy statements.

54

117.    With respect to the Board's duties concerning its oversight of the Company's risks

the 2018 Proxy Statement stated:

**Board Oversight of Risk**

The Board takes an active role in monitoring and assessing the Company's strategic, compliance, operational and financial risks. The Board administers its oversight function through utilization of its various committees. The Company's Risk Management Committee, which consists of members of our senior management, is responsible for oversight of the Company's risk management process. Senior management regularly provides reports on our risks to the Board, the Audit Committee and the Board committees that oversee the applicable risks. Additionally, the Audit Committee discusses with management and the independent auditor the effect of regulatory and accounting initiatives on the Company's financial statements and is responsible for review and evaluation of the Company's major risk exposures and the steps management has taken to monitor and control such exposures. The Audit Committee reviews and assesses the adequacy of the Company's Risk Management Committee Charter annually, amending it as appropriate. In addition, the Compensation Committee, the Environmental, Safety and Sustainability ("ESS") Committee, the Finance Committee and the Nominating and Governance Committee are each charged with overseeing the risks associated with their respective areas of responsibility.

118.    Further, regarding the Audit Committee the 2018 Proxy Statement stated:

*Audit Committee*

- reviewing and evaluating the Company's major risk exposures, including cybersecurity and supplier risks and the steps management has taken to monitor and control such exposures including discussion of the Company's risk assessment and risk management policies; and

- overseeing the Company's compliance with legal and regulatory requirements.

119.    And specifically regarding the ES&S Committee, the 2018 Proxy Statement

detailed the breadth of its duties:

*Environmental, Safety and Sustainability Committee*

The ESS Committee met five times during 2017. The ESS Committee assists the Board in overseeing the programs, performance and risks relative to environmental, safety and sustainability matters. Its responsibilities include, among others:

- evaluating the Company's environmental and sustainability policies, practices and performance;

- evaluating the Company's safety policies, practices and performance relating to our employees, contractors and the general public;

- reviewing and assessing stockholder proposals related to the environment, safety and sustainability;

- reviewing and evaluating the Company's programs, policies, practices and performance with respect to health and safety compliance auditing; and

- assessing major legislation, regulation and other external influences that pertain to the ESS Committee's responsibilities and assessing the impact on the Company.

120.    Those representations in the Proxy Statements conveyed that the Board: (i) maintained sufficient compliance, risk controls, review, and reporting programs to identify and address misconduct; (ii) was unaware of existing material risks that could affect the Company; (iii) had policies to deter unnecessary or "undue risk-taking," including compensation and ethics policies, (v) maintained adequate internal controls, and (v) maintained risk management practices with extensive Board oversight of risk management. However, these representations were materially false and misleading and failed to disclose the serious deficiencies in the Company's practices and individual Board members' bad faith in discharging their fiduciary duties, particularly members of the ES&S Committee.

121.    With respect to director elections, the 2018 Proxy Statement stated that the Board unanimously recommended the re-election of all then current Board members despite the undisclosed breaches of fiduciary duties of the Board and its Committees' oversight and monitoring of NiSource's pipeline safety processes and procedures.

122.    The 2018 Proxy Statement harmed NiSource by interfering with proper governance concerning stockholders' informed voting for directors. As a result of the false or misleading statements in the 2018 Proxy Statement, NiSource stockholders voted to re-elect defendants

56

Hamrock, Candris, Woo, Henretta, Butler, Kabat, Jesanis, Altabef, Bunting, and DeVeydt.

123.   The 2018 Proxy Statement also urged stockholders to approve an advisory resolution regarding compensation paid to named executives. In support of the requested approval, the 2018 Proxy Statement said:

> In considering this proposal, stockholders may wish to consider the following factors that demonstrate our commitment to maintaining a robust compensation program:
>
> • Compensation is closely tied to both corporate and individual performance;
>
> • Annual and long-term incentive compensation opportunities are contingent on the Company achieving pre-established goals;
>
> • Total compensation packages are competitive with those offered by members of the Company's Comparative Group;
>
> • Perquisites are appropriately limited in number and modest in dollar value; and
>
> • Our compensation program does not create incentives for behaviors that create material risk to the Company.
>
> As discussed in the Executive Compensation section of this Proxy Statement, the Compensation Committee and the Board believe that the Company's executive compensation program fulfills the objectives of its compensation philosophy in a prudent and effective manner.

124.   Those statements conveyed that NiSource's compensation system encouraged proper risk management and advanced long-term shareholder value. In reality, NiSource's compensation system actually encouraged – and rewarded – extreme risk-taking and illegal practices. Defendants knew or should have known the executives had breached their fiduciary duties to the Company and exposed it to significant and material risks and liability through their conduct and the resulting violations of federal and state laws, as well as failures to comply with NiSource's obligations to protect public safety.

125.   Under this false impression, numerous NiSource shareholders voted in support of millions in compensation to NiSource executives in 2018, without the benefit of material

information regarding these executives' continued and ongoing failures, which resulted in violations of federal and state laws and criminal charges as reflected in the DPA, and the related concealment of such practices and deficiencies, and their continued and ongoing failure to reform the Company's compensation structures to ensure they did not promote this widespread illegal activity at NiSource.

### H.  Damages to NiSource Resulting From the Individual Defendants' Breaches of Fiduciary Duty

126.    Damages are estimated at more than $1 billion to NiSource. The exact dollar amount of damages to NiSource is presently unknown, but the categories of damages are well developed. NiSource's public filings provide some information regarding the massive costs the Company has and will incur as a result of this tragedy.

127.    NiSource's post-explosion quarterly reports, and the Company's 2019 Annual Report on Form 10-K disclose that the Greater Lawrence Explosions will result in over $1 billion in total costs from third-party claims. Included in this sum is $143 million to settle certain class actions related to the Greater Lawrence Explosions and an $80 million settlement with a family whose child was killed during the explosions. NiSource, however, also disclosed (and the Board's records confirm) that the aggregate amount of third-party liability insurance coverage for the Greater Lawrence Explosions is only $800 million. The $1 billion figure provided in NiSource's public filings excludes: (i) the record $53 million criminal fine NiSource agreed to pay in the DPA; (ii) the sale of Columbia Gas below its book value; (iii) its lost profits on the Columbia Gas sale; (iv) assumed future liabilities; and (v) the increased cost of liability insurance premiums for the foreseeable future. ████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

128.    Indeed, further (and likely non-compensable) damages to NiSource are likely. NiSource's most recent Annual Report on Form 10-K, filed on February 28, 2020, provides the following narrative:

> **The Greater Lawrence Incident has materially adversely affected and may continue to materially adversely affect our financial condition, results of operations and cash flows.**
>
> In connection with the Greater Lawrence Incident, we have incurred and will incur various costs and expenses as set forth in Note 6, "Goodwill and Other Intangible Assets," Note 19, "Other Commitments and Contingencies - C. Legal Proceedings," and "- E. Other Matters" in the Notes to Consolidated Financial Statements.
>
> We are subject to inquiries and investigations by government authorities and regulatory agencies regarding the Greater Lawrence Incident, including the Massachusetts DPU and the Massachusetts Attorney General's Office. We are cooperating with all inquiries and investigations. In addition, on February 26, 2020, the Company and Columbia of Massachusetts entered into agreements with the U.S. Attorney's Office to resolve the U.S. Attorney's Office's investigation relating to the Greater Lawrence Incident, as described further below.
>
> **As more information becomes known, management's estimates and assumptions regarding the costs and expenses to be incurred and the financial impact of the Greater Lawrence Incident may change. A change in management's estimates or assumptions could result in an adjustment that would have a material impact on our financial condition, results of operations and cash flows during the period in which such change occurred.**
>
> **While we have recovered the full amount of our liability insurance coverage available under our policies, total expenses related to the incident have exceeded such amount. Expenses in excess of our liability insurance coverage have materially adversely affected and may continue to materially adversely affect our results of operations, cash flows and financial position.**

129.    Each of these amounts, whether paid by the Company or contingent, could have been prevented had the Individual Defendants not consciously ignored the "red flags" presented to them time and time again during Board and ES&S Committee meetings during the Relevant Period and instituted a reasonable system of monitoring and reporting in compliance with federal

pipeline safety laws.

## VII.    DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

130.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties.

131.    Plaintiff is a shareholder of the Company, was a shareholder of the Company at the time of the wrongdoings alleged herein and has been a shareholder of the Company continuously since December 2013.

132.    Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

133.    As a result of the facts set forth herein, Plaintiff has not made any demand on the Board to institute this action against the Individual Defendants. Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously pursue this action.

134.    The Board currently consists of twelve directors: defendants Candris, Woo, Henretta, Butler, Hamrock, Kabat, Jesanis, Altabef, Bunting and DeVeydt and non-parties Lloyd Yates and Deborah A.P. Hersman.[13] A plaintiff need only demonstrate that half of the directors are interested or lack objectivity. Plaintiff has adequately alleged that at least six directors are incapable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action, for the following reasons:

---

[13]    Non-Party Lloyd Yates was appointed to the NiSource Board on March 10, 2020, after the wrongdoing complained of herein and is not alleged at this time to have breached his fiduciary duties. Non-Party Deborah A.P. Hersman was appointed to the NiSource Board on June 6, 2019, after the wrongdoing complained of herein and is not alleged at this time to have breached her fiduciary duties.

### A. Defendant Hamrock Is Not Independent

135.    Defendant Hamrock is incapable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action because defendant Hamrock's principal professional occupation is his employment as CEO of the Company, pursuant to which he has earned and stands to earn tens of millions of dollars in annual salary, bonuses and other compensation. In 2017, 2018 and 2019, defendant Hamrock earned $4.3 million, $5.1 million and $6.5 million, respectively. Defendant Hamrock was awarded a ***19% raise*** in 2018, the year of the Greater Lawrence Explosions and another ***27% raise*** the year following the incident. Hamrock oversaw more than $1 billion in damages to the Company, and the Board rewarded him with significantly more compensation.

136.    Accordingly, defendant Hamrock is incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action against those defendants who control his annual compensation. The Company's Proxy Statements on Form DEF 14A admit that defendant Hamrock is not independent.

### B. The ES&S Committee Members Face a Substantial Likelihood of Liability Because they Had Actual Knowledge of – or Recklessly Disregarded – Material Undisclosed Facts

137.    Each of the ES&S Committee members (defendants Altabef, Butler, Candris, Henretta, Jesanis and Woo) (and non-members who attended these meetings, defendants Kabat and Hamrock) received actual, timely and fulsome updates regarding the safety problems at regularly scheduled ES&S Committee meetings. These ES&S Committee members alone constitute a majority of the Board. The ES&S Committee's documents confirm that each member was present for these meetings during the Relevant Period and that discussions occurred at each meeting regarding natural gas safety. ███████████████████████

138.    The ES&S Committee Charter mandated they "review and evaluate the Company's programs, policies, practices and performance with respect to employee, contractor and public safety." The Company's programs, policies and practices with respect to safety were a "mission critical" oversight responsibility given the highly regulated environment the Company operates in and the federal regulations governing the operation of natural gas pipelines in the federal Natural Gas Pipeline Safety Act of 1968 and the Pipeline Safety Act of 1994. In short, the ES&S Committee members had an unequivocal duty to act and failed to do so.

139.    The Company's post-explosion actions confirm their pre-explosion misconduct. Board meeting minutes and ES&S Committee meeting minutes before and after the Greater Lawrence Explosions present a stark contrast in oversight (or lack thereof) and action by the Individual Defendants. It is only post-explosion where the ES&S Committee's records show any commitment to oversight by the Individual Defendants.

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████

140.    Despite the lack of a necessary compliance oversight system (like the one implemented post-explosion), the ES&S Committee members were still provided with sufficient information to determine that Columbia Gas' operations were safety-deficient and specifically that the low-pressure distribution system was at heightened risk. These "red flags" should have been sufficient to warrant oversight of this mission critical segment of the Company's operations and a remediation of the Company's safety policies. Instead, these red flags were ignored.

141.    A review of the professional backgrounds of the ES&S Committee members demonstrates the ineptitude of the ES&S Committee members.  Not a single member of the ES&S Committee (at the time of the explosions) disclosed any experience with natural gas production or at a natural gas utility in their biographies found on NiSource's website. Shockingly, only three non-management directors (out of twelve) have such a background. Two are non-parties Lloyd Yates and Deborah A.P. Hersman, who joined the Board after the Greater Lawrence Explosions. Only one Board member at the time of the Greater Lawrence Explosions had prior experience with natural gas production or at a natural gas utility and that was defendant Jesanis, who was not a member of the ES&S Committee at that time (although he had been a member in earlier periods).

142.    The ES&S Committee meeting immediately prior to the Greater Lawrence Explosions (dated August 6, 2018) states that the ES&S Committee was comprised of defendants Altabef, Butler, Candris, Henretta and Woo (with Messrs. Kabat and Hamrock also in attendance). NISOURCE001285. As such, at the time of the Greater Lawrence Explosion, not a single member of the ES&S Committee had any experience whatsoever with the delivery of natural gas and related

63

<u>safety issues.</u> Because the ES&S Committee members (and defendants Kabat and Hamrock, who attended meetings as if they were ES&S Committee members) were provided, time and time again, with "red flags" regarding the substandard safety conditions at Columbia Gas, they acted in bad faith and in violation of their fiduciary duties by ignoring these "red flags" and failing to implement appropriate safety and oversight systems. Their misconduct in failing to do so led to tragic, predictable results and renders demand futile.

### C. The Entire Board Faces a Substantial Likelihood of Liability Because they Had Actual Knowledge of – or Recklessly Disregarded – Material Undisclosed Facts

143.    The Individual Defendants (and in particular the Audit Committee members, defendants Woo, Butler, Jesanis, Bunting, Kabat and DeVeydt) were responsible for reviewing and approving the Company's SEC filings and financial statements prior to their publication. None of the Company's SEC filings during the Relevant Period disclosed the known, serious safety problems the Company's Columbia Gas subsidiary was experiencing.

144.    The generic risk disclosure found in the Company's Annual Report on Form 10-K (reproduced above at ¶63), was insufficient to alert shareholders to the true issues the Company was facing. ██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████

██    ██████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████ The Board had a duty to ensure the

Company operated in a safe manner consistent with their obligations as a regulated utility.

146.    The Board also had a duty to ensure that the Company's SEC filings did not omit material information. Again, each Individual Defendant failed to do so. The omission of the above safety information was just such an omission. A director's breach of the duty of candor is not entitled to protection under the business judgment rule.

147.    As a result, any demand upon the Individual Defendants to bring suit against themselves would be a useless and futile act. The Individual Defendants' knowing and/or reckless breaches of fiduciary duty constitute bad faith under Delaware law. Bad faith conduct is non-exculpable and is not protected under the business judgment rule. Thus, all Individual Defendants face a substantial likelihood of liability. Demand is thus futile and excused.

148.    Furthermore, each Individual Defendant signed the Company's 2017, 2018 and 2019 10-K, which failed to disclose the Company's failing safety culture and protocols, making each materially false and misleading. As such, each Individual Defendant faces a substantial likelihood of personal liability, excusing demand.

### D. The Entire Board Was Required to Ensure NiSource Operated in Compliance with Federal Pipeline Safety Laws

149.    The full Board was required to ensure that the Company followed federal regulations governing the operation of natural gas pipelines in the federal Natural Gas Pipeline Safety Act of 1968 and the Pipeline Safety Act of 1994. Each Individual Defendant on the Board

failed to do so, despite seeing "red flags" which indicated serious and systemic safety problems at Columbia Gas.

150.    Legal compliance with federal and state safety laws was a "mission critical" function for NiSource. Thus, each Individual Defendant was required to ensure that NiSource was complying with these laws and related regulations. NiSource's failure to prepare and follow federal procedures for the starting up and shutting down of a pipeline was an *ultra vires* act, which cannot be protected business judgment. █████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████

151.    The Board's decision to not implement such a compliance system, particularly where, as here, the Company operates in the midst of "mission critical" regulatory environment, is indefensible. As the Massachusetts U.S. Attorney stated, "Columbia Gas, through a pattern of flagrant indifference in the face of extreme risk to the life and property, knowingly violated minimum safety standards." Such "knowing violations" of federal safety laws are *ultra vires* and thus demand is excused for each of the eleven Board members named herein as Individual Defendants who were on the Board during the Relevant Period.

### E.  Demand is Futile for Additional Reasons

152.    NiSource's officers and directors are protected against personal liability for their acts of mismanagement and breach of fiduciary duty alleged in this complaint by directors' and officers' liability insurance, which they caused the Company to purchase for their protection with corporate funds, *i.e*., monies belonging to the stockholders of NiSource. However, the directors' and officers' liability insurance policies covering the Individual Defendants contain provisions that eliminate coverage for any action brought directly by NiSource against these defendants, known as the "insured versus insured exclusion."

153.    As a result, if the Individual Defendants were to sue themselves, there would be no directors' and officers' insurance protection. Thus, the Individual Defendants will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate a recovery. This justification for demand excusal is particularly relevant for this Action because the Company has pled guilty to criminal charges. Director and officers' liability insurance commonly excludes coverage for criminal acts—which the Company has admitted to. It is entirely possible that should the Company demand payment from the Company's directors and officers' liability carriers, those carriers would deny coverage based on the Company having admitted to underlying criminal acts. ▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

███████████████████████ Accordingly, demand on the Individual Defendants is futile, and therefore, excused.

## VIII.    CLAIMS

### CLAIM I
### VIOLATION OF SECTION 14(A) OF THE EXCHANGE
### ACT AGAINST THE PROXY DEFENDANTS

154.    Plaintiff incorporates by reference the allegations set forth above as though fully restated herein, except to the extent those allegations plead knowing or reckless conduct by the Proxy Defendants (*i.e.,* collectively, defendants Hamrock, Candris, Woo, Henretta, Butler, Kabat, Jesanis, Altabef, Bunting, and DeVeydt). This claim is based solely on negligence, not on any allegation of reckless or knowing conduct by or on behalf of the Proxy Defendants. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to this claim.

155.    SEC Rule 14a-9 (17 C.F.R. § 240.14a-9), promulgated under Section 14(a) of the Exchange Act provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

156.    The Proxy Defendants negligently issued, caused to be issued, and participated in the issuance of materially false and misleading written statements to stockholders that were contained in the 2017 Proxy Statement and the 2018 Proxy Statement. The 2017 Proxy Statement and the 2018 Proxy Statement contained proposals to NiSource's stockholders urging them to re-elect the members of the Board and approve executive compensation. These Proxy Statements, however, misstated or failed to disclose: (1) NiSource was knowingly and willfully violating state

and federal minimum pipeline safety standards; (2) the Company had ignored a "near miss" that occurred at one of its pipeline subsidiaries and failed to implement preventative practices and risk mitigation policies to protect public safety; (3) the Company did not maintain consistent and reliable records and necessary information for pipeline safety; and (4) the Company exhibited a flagrant organizational indifference towards minimum gas pipeline safety standards. The Proxy Statements also omitted any disclosures reflecting or acknowledging that Defendants failed to take appropriate steps to address the known risks to public safety from the near miss that had occurred at another NiSource subsidiary.

157.    By reasons of the conduct alleged in this Complaint, the Proxy Defendants violated Section 14(a) of the Exchange Act and SEC Rule 14a-9. As a direct and proximate result of the Proxy Defendants' wrongful conduct, NiSource misled or deceived its stockholders by making misleading statements that were an essential link in stockholders heeding NiSource's recommendation to re-elect those directors and approve certain executive compensation.

158.    The misleading information contained in the 2017 Proxy Statement and the 2018 Proxy Statement was material to NiSource's stockholders in determining whether or not to elect the Proxy Defendants and approve certain executive compensation. This information was also material to the integrity of the directors that were proposed for election to the Board. The proxy solicitation process in connection with the Proxy Statements was an essential link in (i) the re-election of nominees to the Board, and (ii) the approval of executive compensation.

159.    Plaintiff, on behalf of NiSource, thereby seeks relief for damages inflicted on the Company based on the misleading 2017 and 2018 Proxy Statements in connection with the improper re-election of the members of the Board and approval of executive compensation.

160.    This action was timely commenced within three years of the date of each Proxy

Statement and within one year from the time Plaintiffs discovered or reasonably could have discovered the facts on which this claim is based.

## CLAIM II
**AGAINST ALL INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES FOR FAILING TO PROPERLY OVERSEE AND MANAGE THE COMPANY**

161.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

162.    The Individual Defendants owed and owe NiSource fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants specifically owed and owe NiSource the highest obligation of good faith, fair dealing, loyalty and due care.

163.    The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

164.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, NiSource has sustained significant damages, not only monetarily, but also to its corporate image and goodwill.

165.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

166.    Plaintiff, on behalf of NiSource, has no adequate remedy at law.


## CLAIM III
**AGAINST ALL INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY OF CANDOR**

167.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

168.    As alleged in detail herein, each of the Individual Defendants had a duty to ensure that NiSource disseminated accurate, truthful and complete information to its shareholders.

169.    The Individual Defendants violated their fiduciary duties of care, loyalty, and good faith by causing or allowing the Company to disseminate to NiSource's shareholders materially misleading and inaccurate information through, inter alia, SEC filings and other public statements and disclosures as detailed herein. These actions could not have been a good faith exercise of prudent business judgment.

170.    As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

**CLAIM IV**
**AGAINST ALL INDIVIDUAL DEFENDANTS FOR UNJUST ENRICHMENT**

171.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

172.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of NiSource.

173.    Plaintiff, as a shareholder and representative of NiSource, seeks restitution from the Individual Defendants, and each of them, and seeks an order of this Court disgorging all profits, salaries, benefits and other compensation obtained by these Individual Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiff demands judgment as follows:

A.      Against all the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

B.      Directing NiSource to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company

and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

C.      Awarding to NiSource restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Individual Defendants;

D.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: April 28, 2020

PUBLIC VERSION
Filed: May 5, 2020

*Of Counsel for Plaintiff:*

Daniel S. Sommers
Joshua Handelsman
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave. NW, Fifth Floor
Washington, D.C. 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
dsommers@cohenmilstein.com
jhandelsman@cohenmilstein.com

**COOCH AND TAYLOR, P.A.**

By: ___/s/ *Carmella P. Keener*_____
Carmella P. Keener (#2810)
The Nemours Building
1007 N. Orange Street, Suite 1120
P.O. Box 1680
Wilmington, DE 19899-1680
(302) 984-3816
ckeener@coochandtaylor.com

Richard A. Speirs
Amy Miller
**COHEN MILSTEIN SELLERS & TOLL PLLC**
88 Pine Street, 14th Floor
New York, NY 10005
Telephone: (212) 838-7797
Facsimile: (212) 838 7745
rspeirs@cohenmilstein.com
amiller@cohenmilstein.com

Kip B. Shuman
**SHUMAN, GLENN & STECKER**
100 Pine Street, Ste. 1250
San Francisco, CA 94101
Telephone: (303) 861-3003
Facsimile: (303) 536-7849
kip@shumanlawfirm.com

Rusty E. Glenn
**SHUMAN, GLENN & STECKER**
600 17th Street, Suite 2800 South
Denver, CO 80202
Telephone: (303) 861-3003
Facsimile: (303) 536-7849
rusty@shumanlawfirm.com

Brett D. Stecker
**SHUMAN, GLENN & STECKER**
326 W. Lancaster Avenue
Ardmore, PA 19003
Telephone: (303) 861-3003
Facsimile: (303) 536-7849
brett@shumanlawfirm.com

Ronald A. King
**CLARK HILL PLC**
212 E. Cesar Chavez Avenue
Lansing, MI 48906
Telephone: (517) 318-3015
Facsimile: (517) 318-3068
rking@clarkhill.com